UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

SECURITIES INVESTOR PROTECTION
CORPORATION,

                                 Plaintiff,

      – against –

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                             Defendant.

: : : : : : : : : : : :

Adv. Pro. No. 08-01789 (SMB)

SIPA LIQUIDATION

(Substantively Consolidated)

------------------------------------------------------X

In re:

      BERNARD L. MADOFF,

                             Debtor.

: : : : : :

------------------------------------------------------X

IRVING H. PICARD, Trustee for the
Liquidation of Bernard L. Madoff Investment
Securities LLC,

                   Plaintiff-Appellee,

       - against -

DEFENDANTS LISTED ON ECF NO. 14283,

                Defendants-Appellants.

: : : : : : : : : : :

Adv. Pro. Nos. 10-04995
                10-04818
                10-04914
                10-04826
                10-04644
                10-04541
                10-04728
                10-04905
                10-04621

------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER
## AFFIRMING ORDER OF DISCOVERY ARBITRATOR

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111

      David J. Sheehan, Esq.
      Dean D. Hunt, Esq.
      Lan Hoang, Esq.
      Nicholas J. Cremona, Esq.
      Seanna R. Brown, Esq.
      Maximillian S. Shifrin, Esq.
            Of Counsel

*Attorneys for Plaintiff-Appellee*

CHAITMAN LLP
465 Park Avenue
New York, NY 10022

>  Helen Davis Chaitman, Esq.
>  Gregory M. Dexter, Esq.
>  Of Counsel

*Attorneys for Defendants-Appellants*

**STUART M. BERNSTEIN
United States Bankruptcy Judge**

The Defendants-Appellants ("Defendants") appeal from the *Discovery Arbitrator's Order*, dated Dec. 24, 2018 and filed on January 2, 2019 ("*Order*") (AA13-19)[1] issued by retired Magistrate Judge Frank Maas, the Discovery Arbitrator ("Discovery Arbitrator"), denying the Defendants' application to compel discovery from Plaintiff-Appellee, Irving H. Picard ("Trustee"), the Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") pursuant to the Securities Investor Protection Act ("SIPA"). The discovery concerns the BLMIS Database consisting of approximately 30 million electronic documents and 13,000 boxes of hard copy documents maintained in a Queens warehouse. The Trustee has already made substantial productions and attempted to work with the Defendants' counsel, Helen

---

[1]    In this opinion, "AA" refers to Defendants' Appendix of the appeal record, "TA" refers to the Plaintiff's Supplemental Appendix of the appeal record, "ECF Main Case Doc. # _" refers to documents filed in the BLMIS SIPA liquidation, *In re BLMIS*, SIPA Case No. 08-01789 (SMB), and "ECF Doc. # _" refers to documents filed in *Picard v. Wilenitz*, Adv. Pro. No. 10-04995 (SMB).

Davis Chaitman, Esq., but the parties were unable to agree on further discovery.  For the reasons that follow, the *Order* is affirmed.

## BACKGROUND

The dispute underlying this appeal arises from the massive Ponzi scheme that Madoff ran through BLMIS's investment advisory ("IA") business, sometimes referred to as "House 17."  At the time he pled guilty, Madoff allocuted that he began the Ponzi scheme in the early 1990s.  He promised BLMIS's IA customers that he would invest their funds pursuant to a split strike conversion strategy, he never made those investments, he reported fictitious transactions to his customers and falsely represented that their "investments" had earned profits and when a customer requested a redemption, BLMIS paid the redemption request using money that other customers had given BLMIS to invest on their own behalf.  (*Transcript of March 12, 2009 Hr'g in United States v. Madoff* ("Madoff Allocution") at 24:9-27:16.)[2]  The Trustee alleges that the Defendants, former BLMIS IA customers, are "net winners" who withdrew more from their respective BLMIS accounts than they deposited into their respective BLMIS accounts.  He sued the Defendants to avoid the transfers and recover the fictitious profits they received from BLMIS within two years of the December 11, 2008 filing date of the SIPA liquidation of BLMIS.

In addition to the IA business, BLMIS also operated two divisions engaged in actual proprietary trading and market making (sometimes referred to as "House 5")

---

[2]    A copy of the Madoff Allocution is available at ECF Main Case Doc. # 16237-5.

which used IA customer funds to make trades for BLMIS's own account. The Defendants contend that BLMIS allocated the House 5 trades to the IA customers on their customer statements and they are entitled to keep the profits earned from those actual trades. This, in turn, would reduce the amount of fictitious profits they withdrew from their respective BLMIS accounts and decrease their exposure. The Defendants have been seeking the trading records for the period prior to 1992 that allegedly show BLMIS's actual purchases of securities.[3]

With this background, I turn to the parties' discovery dispute.

## A.    Trustee's Initial Disclosures and E-Data Room

On December 21, 2015, the Trustee served initial disclosures in the *Wilenitz* adversary proceeding.[4]  (TA001.)  His initial disclosures described the universe of documents in his possession, custody or control:

> approximately 13,500 boxes of BLMIS paper documents and 19,250 media sources containing electronically stored information ("ESI"), which include . . . computers . . . microfilm, microfiche . . . and memory cards. . . . With respect to these materials, some paper and some ESI have been loaded for potential production in the Trustee's cases in one or more electronic databases, totaling 4.0 terabytes or 28.8 million documents. Materials not contained on the databases are stored in Long Island City, New York or Rosendale, New York.  The Trustee is also in possession of over 5 million documents received from approximately 450 parties during

---

[3]    The onset date of the Ponzi scheme is disputed.  While Madoff's allocution fixed it at some time in the early 1990s, the Trustee contends that BLMIS operated the IA side of the business as a Ponzi scheme as far back as the 1970s.  The Defendants contend that BLMIS did not operate the IA business as a Ponzi scheme prior to 1992.

[4]    Federal Civil Rule 26(a)(1)(ii) requires that a party provide either a copy, or a description by category and location, of documents and other things in its possession, custody, or control that it may use to support its claims and defenses.

the course of this action, including during the investigation and litigation of adversary proceedings.

(TA003-04.)  The Trustee added that he "intends to make available a set of approximately four million documents in a virtual data room ("E-Data Room")[5] to prove that BLMIS was a fraudulent enterprise . . . ."  (TA005.)  Upon signing a non-disclosure agreement, defendants could gain access to the E-Data Room, and the Trustee provided a manual on how to search for data.  (*See* TA009-TA035 (data room manual).)

The E-Data Room essentially contained the Trustee's working electronic file.  It included all of the documents relied upon by Bruce G. Dubinsky, who rendered a report in 2013 ("Dubinsky Report")[6] in which he opined, among other things, that the IA side of BLMIS was always operated as a Ponzi scheme.  It also included all of the discovery and disclosure documents produced by the Trustee.  (*Order* at AA15.)

## B.    Chaitman's First Discovery Requests in *Wilenitz*

On March 8, 2016, defendants in *Picard v. Wilenitz* served their first set of document demands and interrogatories.  Request no. 16 asked the Trustee to "[p]rovide the gross trading volume by both number of shares traded and total dollar volume for each year of Madoff's operation, broken down" among BLMIS's three divisions and to produce related documents.  (TA053.)  Request no. 18 asked:

> For each security listed on the Defendants' account statements for each year from 1982 on, set forth the number of shares of the listed companies'

---

[5]    The Trustee's initial disclosures defined the virtual data room as "E-Data Room 1."  The Court will refer to it as E-Data Room for simplicity's sake.

[6]    A copy of the Dubinsky Report was filed on the main case docket on November 25, 2015, (ECF Main Case Doc. # 12137-1), before the *Wilenitz* defendants served their first discovery request.

stock that BLMIS held at that time; and, if the stock was specified as belonging to a particular customer, specify the customer and the number of shares shown on BLMIS' records as being owned by that customer. Produce the documents on which you base your responses.

(TA055.)

The Trustee objected and responded to the request on April 8, 2016.  (TA036-TA063.)  His response stated that Wilenitz could ascertain the information regarding trading by comparing the DTC records[7] in the E-Data Room with the account-specific documents produced by the Trustee with his initial disclosures.  (TA055.)

In addition, the Trustee provided a general overview of the universe of BLMIS documents in his response.  Among other things, he stated that he maintains an internal electronic database ("BLMIS Database") containing almost 30 million documents from which the Trustee can run searches as necessary to respond to case-specific discovery requests, (TA039-40), but that there were "nearly 20,000 pieces of BLMIS ESI and millions of pages" of unprocessed documents not included in the BLMIS Database. (TA040.)

---

[7]      The Depository Trust Company (DTC) is the predecessor to the Depository Trust & Clearing Corporation (DTCC) (collectively, the "DTC") which, through its subsidiaries, provides clearance and settlement for almost all equity, bond, government securities, mortgage-backed securities, money market instruments and OTC derivative transactions in the U.S. market.  For any of these types of trades to occur in the U.S., each individual security transaction must be routed through the DTC before it can be finalized. (Dubinsky Report at ¶ 156 n. 167.)  In other words, if BLMIS made an actual trade, it would be reflected in the DTC's records.

**C.    May 2016 Discovery Conference**

After receiving letters from the Trustee seeking to move for a protective order, (ECF Doc. #63), and Chaitman seeking to move to compel, (ECF Doc. # 64), the Court held a discovery conference on May 17, 2016.  (*See* AA79-157 (hearing transcript).)  During the May 2016 conference, Chaitman insisted that she wanted to make a formal motion to compel discovery "[b]ecause it's important for the record to contain an order." (AA100[8]:24-25; *accord* AA101:4-6).)  The Court noted that she could make the motion but nonetheless attempted to narrow the issues by reviewing each of the discovery requests.  With respect to request no. 16 (*i.e.*, the trading breakdown for each BLMIS division), the Trustee represented that all post-2002 BLMIS DTC records were in a subfolder in the E-Data Room and available to Chaitman.  (AA137:15-139:11.)  Chaitman replied that she already had the DTC records, she wanted other records, and the Trustee responded that any non-DTC records were also in the data room.  (AA139:12-17.)  As to request no. 18 (*i.e.*, matching securities held by BLMIS with securities appearing on Defendants' IA customer statements), the Trustee replied that the Dubinsky Report showed that the IA business never engaged in actual securities trading.  (AA146:9-15.)  The Court asked how Chaitman could test Dubinsky's conclusion, and the Trustee replied, "[s]he tests that conclusion the same way our expert does, by examining the underlying records [which are] in the data room."  (AA146:17-21.)  The Court agreed and

---

[8]    For clarity, the page numbers refer to the page of the appeal appendix, not the underlying transcript.

told Chaitman that "it's a lot of work," but "you're going to have to [analyze the underlying documents] yourself if this stuff is available." (AA147:6-8.)

Chaitman then raised a concern that the Trustee could update the E-Data Room without her knowing, and the Court replied:

> THE COURT: . . . [I]f the Trustee has additional documents, he's got to supplement the disclosure or the production, which he does by adding them to the data room, and maybe you have a continuing duty to check the data room.
>
> But part of the problem is you've thrown such a broad net over what you're looking for, instead of the specific documents relevant – that I think seem to be relevant to this particular case, that you run into a situation where there may be documents added about something but they have nothing to do with Wilenitz.

(AA147:19-148:3.)

## D.    Chaitman's First Motion to Compel

Chaitman made the formal motion to compel in the *Wilenitz* adversary proceeding on August 29, 2016 including with respect to request nos. 16 and 18. (*See Defendants' Memorandum of Law in Support of Motion (a) to Compel Discovery Pursuant to Fed. R. Civ. P. 37, (b) for an Order Finding Plenary Waiver of Privilege, and (c) for an Order Barring the Trustee From Using at Trial any Evidence Not Produced During Fact Discovery*, dated Aug. 29, 2016 at 26-27 (ECF Doc. # 69).) After the Trustee filed his opposition brief, (ECF Doc. # 72), the parties stipulated to the arbitration of the discovery dispute in *Wilenitz* and certain other adversary proceedings before the Discovery Arbitrator. (*Stipulated Order Appointing the Special Discovery*

8

*Arbitrator*, dated Oct. 17, 2016 (ECF Doc. # 75).)[9]  The Trustee stated at the December 13, 2016 hearing before the Discovery Arbitrator that every trading record he processed was in the E-Data Room, but there were a large number of other documents in the warehouse (*e.g.*, paper, floppy disk, microfiche, etc.) that the Trustee had not processed. (*See* TA216:18-217:20, TA221:3-224:4, TA230:18-231:13.)  However, the Trustee represented that his professionals were looking for older trading records to the extent they existed.  (TA218:17-25, TA229:20-230:15.)  The Discovery Arbitrator asked the Trustee how long it would take for his professionals to perform a good-faith search for older trading records, and the Trustee replied that he would consult with his professionals and inform the arbitrator in one week about a timeframe.  (TA232:22-233:9, TA291:6-12.)

On December 15, 2016, the Trustee sent the Discovery Arbitrator a letter (with a copy to Chaitman) updating him on his ongoing search for pre-2002 trading records. (TA362-65 (Trustee's letter).)  The Trustee highlighted the following efforts:

- Found 95 documents related to DTC and/or its affiliate NSCC that may reflect pre-2002 trading which will be produced to Chaitman by the end of the week;

- Will produce an additional 18,306 documents that hit "Depository Trust" or "National Securities" in the BLMIS Database;

- Have started processing (through a vendor) 167 reels of microfilm that may contain pre-2002 trading records and will produce responsive documents; and

---

[9]     The Court had appointed the Discovery Arbitrator on October 4, 2016.  (*Order Appointing a Discovery Arbitrator Pursuant to Bankruptcy Rule 9019(c) and General Order M-390*, dated Oct. 4, 2016 (ECF Main Case Doc. # 14227).)  Proceedings before the Discovery Arbitrator were purely voluntary.

- Will provide (i) an index of hard-copy BLMIS documents categorizing documents scanned from 13,000 boxes,[10] and (ii) an index of electronic media identifying data from servers, computers and other media.

(TA362-64.)

On January 4, 2017, the Discovery Arbitrator entered an order (AA159-62) memorializing the rulings from the December 2016 arbitration.  The order provided in relevant part: (i) the Trustee should "indicate how long it will take to make a good faith determination as to whether there are any BLMIS trading records for the years prior to 1992" (AA160 at ¶ 4); (ii) it denied discovery requests 16 and 18 which "seek information concerning the volume of business conducted by each sector of BLMIS and the number of shares of securities listed on Wilenitz's account statements that BLMIS held" because "(a) the underlying records have been made available to the Defendants and the other clients of Chaitman LLP, and (b) the burden of undertaking the requested investigation would be extensive" but "to the extent there are any additional relevant records of securities trading that have not been made available to Wilenitz through [E-Data Room], they must promptly be produced."  (AA161 at ¶ 13.)

On January 5, 2017, the Discovery Arbitrator held a follow-up telephonic conference with the parties.  (TA366-439.)  The parties and the Discovery Arbitrator mainly discussed the Trustee's ongoing efforts, which were essentially set forth in his December letter.  The Discovery Arbitrator observed:

---

[10]    The Trustee noted that there were boxes which were not scanned but still housed in the Queens warehouse.  (TA364.)

ARBITRATOR MAAS:  And as I recall, [the Trustee was] restoring numerous [microfiche] records in an effort to determine whether there is anything else, and perhaps were doing other things, and also were giving you an index as to what files exist.

I can't very well require them to go through every box that existed in the storeroom.  So people have to make educated guesses.

I don't disagree with you that there was some waffling about how long it will take.  But under the circumstances I think the Trustee has probably done as best as he could do at this point.

As we move forward and as time goes on, if you're not getting materials and you think there are materials, or you think their search has not been sufficiently robust, we can discuss that.

(TA383:16-384:10.)

## E.    Chaitman's Second Motion and the Protocol

In February 2017, Chaitman filed a second motion before the Discovery Arbitrator to compel the Trustee to produce records evidencing pre-1992 trades.  The Discovery Arbitrator acknowledged the efforts the Trustee had made.  In particular, his vendor had restored 167 reels of microfilm that might contain pre-2002 trading records which the Trustee had already produced, and the Trustee promised to produce an additional 34 reels that he had identified as potentially containing pre-1992 trading records, all at a cost of roughly $500,000.00.  He also agreed to produce text searchable indices of the hard copy BLMIS documents contained in the approximate 13,000 boxes in the Queens warehouse and the electronic media obtained by BLMIS.  (AA167-68.)

The Discovery Arbitrator attributed the ongoing nature of the dispute in part to the parties' "failure to have any face-to-face discussions."  (AA169.)  He also observed that Chaitman should be able to focus her request because the Trustee gave her the indices of the hard copy and electronic documents.  (AA169.)  To expedite the resolution

of any further dispute regarding the pre-1992 trading records, he imposed the following

protocol ("Protocol"):

1. Chaitman must send a letter to the Trustee three days before a "meet and confer" "identifying the additional documents she seeks to have produced, and where she believes they may be found," bearing in mind that discovery requests are limited under Federal Civil Rule 26 by the concepts of relevance and proportionality;

2. If the dispute remains after having conferred in good faith, the parties should send the Discovery Arbitrator a joint letter not to exceed five pages detailing the dispute; then

3. The Discovery Arbitrator would resolve the dispute or schedule a further conference.

(AA169-70.)  Accordingly, the Discovery Arbitrator denied Chaitman's second motion to

compel without prejudice to renewal "after counsel have conferred in good faith."

(AA170.)

## F.    Madoff Day 2 Deposition and Chaitman's Brief

During the summer of 2017, the parties geared up for the Madoff Day Two

deposition,[11] briefing what topics should be addressed in the deposition.  Chaitman's

brief dated June 26, 2017 (ECF Main Case Doc. # 16236) extensively discussed the

trading records dispute.  She focused on the Trustee's alleged misrepresentations

regarding the existence of pre-1992 trading records, this Court's supposed order issued

during the May 2016 conference directing production of pre-1992 trading records and

the Discovery Arbitrator's January 2017 order (ordering the Trustee to produce trading

---

[11]    The "Madoff Day Two" deposition refers to the latter half of a five-day deposition of Bernard Madoff which occurred between December 2016 and November 2017 in eighty-eight adversary proceedings.  *See SIPC v. BLMIS* (*In re BLMIS*), No. 08-01789 (SMB), 2019 WL 654293, at *2-3 (Bankr. S.D.N.Y. Feb. 15, 2019) (describing the Madoff Deposition).

12

records).  She failed to mention the denial of her second motion to compel or the establishment of the Protocol.

The Court held a hearing on the Madoff Day Two topics on June 29, 2017 (transcript at ECF Main Case Doc. # 16332).[12]  During the hearing, Chaitman again stated that the Trustee had "deliberately concealed" trading records from her, (*id.* at 36:19-20), and she had just learned about the existence of 4,700 reels of microfilm.  (*Id.* at 38:5-7.)  During the deliberations, the Court, unaware of the Protocol or the disposition by the Discovery Arbitrator of the requests for trading records, told Trustee's counsel:

> THE COURT:  There are two orders directing you to turn over the documents.  You haven't told me that they're not relevant.

(*Id.* at 74:14-16.)  After some further discussions, I scheduled a follow-up conference for the Trustee to update the Court on how long he needed to review the additional microfilm reels.  (*Id.* at 79:20-80:6.)

## G.    The Microfilm Protocol

The Trustee and Chaitman submitted letters dated July 14, 2017 (ECF Main Case Doc. # 16348) and July 24, 2017 (AA183-93), respectively, regarding the additional reels of microfilm.  At the July 26, 2017 conference, and after much back and forth about which microfilm reels had been produced and which had not, the Court indicated that the Trustee would not have to turn over the 4,700 microfilm reels at that point:

---

[12]    The Defendants' appendix included only a single page of this hearing transcript (*see* AA35) and the Trustee did not include it in his appendix.

> THE COURT:  With respect to the 4,700 [reels], you're not going to convince me to simply force the trustee to turn them over.  You're going to have to make a showing through a motion or through negotiation.

(TA493:10-13.)  The Court suggested that Chaitman review the Trustee's index of microfilm reels and pick a small representative sampling of twenty reels ("Microfilm Protocol").  (TA494:14-20.)  Chaitman was not receptive to this idea, and the Court indicated she could make her argument in a motion to compel.  (TA494:21-496:21.)

## H.    Chaitman's Proposed Sanctions Motion

In November 2017, Chaitman served a third set of requests for production of documents on the Trustee.  In request no. 1, Chaitman sought "[a]ll records evidencing securities trades placed by or on behalf of [Madoff or BLMIS], or on behalf of customers of [Madoff or BLMIS], with or by third parties, regardless of whether the records evidence 'House 5' or 'House 17' trading."  (TA546.)  The Trustee responded and objected, (TA541-50), stating, among other things, that the parties had reached an agreement at a November 14, 2017 meet and confer under which the Trustee agreed to "search for and review additional potentially responsive records from the universe of Third-Party Documents" and to "produce such records on a rolling basis within four to six weeks."  (TA547.)

On April 11, 2018, Chaitman sent a letter to the Court seeking permission to move for sanctions.  (*See* ECF Doc. # 100.)  She said that she did not find that reviewing the twenty reels under the Microfilm Protocol to be productive.  (*Id.* at 1; *see also* TA560:4-9.)  Instead, Chaitman accused the Trustee of failing to turn over trading records in the BLMIS Database and asserted that sanctions under Federal Civil Rule 37

14

were proper because the Trustee had violated two orders to produce trading records (*i.e.*, the statement from the May 2016 conference and the Discovery Arbitrator's January 2017 order).  (*Id.* at 1-2.)

The Trustee responded on April 20, 2018.  (*See* ECF Doc # 106.)  He pointed out that since 2016, he had produced over 260,000 documents (4.7 million pages) in connection with this dispute as well as three indices.  (*Id.* at 1.)  The Trustee also clarified what had actually occurred before the Discovery Arbitrator, including the creation of the Protocol – a procedure Chaitman had wholly ignored.  (*Id.* at 2-3.)  Last, he stated that the Trustee had nonetheless continued to work with Chaitman including a recent production of third-party documents agreed-to at a meet-and-confer.  (*Id.* at 4.)

The Court held a conference on May 1, 2018.  I began:

THE COURT:  Well, I've read the papers.  And I guess I didn't realize it before, maybe I did, that [the Discovery Arbitrator] had set up a procedure to narrow the issues and narrow the dispute.  And part of that required the parties to meet and confer, which you apparently did, and then to write a letter to [the Discovery Arbitrator] identifying the sources of what's still left, what's the disagreement.  And I didn't see that letter.

(TA556:10-17.)  While the Court wouldn't stop Chaitman from filing a sanctions motion, she was advised that she would likely lose the motion and could be liable for the Trustee's attorneys' fees and costs if she failed to follow the Protocol.  (TA556:6-557:4.) After further discussion regarding what had and had not been produced, Chaitman agreed to adhere to the Protocol.  (TA568:21-22.)

## I.    The *Order*

Pursuant to the Protocol, the parties submitted a joint letter to the Discovery Arbitrator on September 20, 2018.  In that submission, Chaitman sought access to the entire BLMIS Database.  (AA16.)  The Discovery Arbitrator held a hearing on November 19, 2018, and the following day, Chaitman submitted a letter to the Discovery Arbitrator enlarging her request to include any third-party records in the Queens warehouse based, according to the Discovery Arbitrator, "on the entirely unsupported assertion that the Trustee had intentionally incorporated into the BLMIS Database only those items which would support his claim."  (AA17.)

The *Order* issued by the Discovery Arbitrator, which is the subject of this appeal, began by recounting the long and tortuous history of the dispute regarding the pre-1992 trading records and the Trustee's efforts to accommodate Chaitman's ever changing demands.  (AA15-17.)  In addition to the documents available in the E-Data Room, the Trustee had produced 18,306 records from the BLMIS Database that hit on the search terms "Depository Trust" and "National Securities," 167 reels of microfilm that might contain additional trading records from 2002 or earlier and an additional 34 reels with pre-1992 labeling all at the cost of $500,000.00, a searchable copy of the warehouse index and an index of the electronic media that the Trustee had obtained from BLMIS which "should have enabled Ms. Chaitman to formulate more focused requests for trading records," and all of the documents responsive to an additional 147 search terms that he had identified based on internal BLMIS reports reflecting trading activity. (AA16.)  In response to Chaitman's request for the production of five million documents responsive to twenty-two search terms incorporating common financial institution

names like Fidelity and Morgan Stanley, the Trustee ran two of those terms.  His search

confirmed that the use of all twenty-two proposed search terms would return largely

irrelevant documents, such as emails.  (AA17.)  Alternatively, the Trustee agreed to run

certain BLMIS account numbers against the third-party materials produced to the

Trustee in response to Federal Bankruptcy Rule 2004 subpoenas and turned over those

documents.  (AA17.)  After Chaitman complained that the Trustee had not also run those

terms against the BLMIS Database, the Trustee did so, and produced the responsive

documents.  (AA17.)  The Trustee indicated that the account number searches he

conducted in response to Chaitman's requests yielded nearly 200,000 pages of material,

comprising 10,000 documents.  (AA17.)  With each production, Chaitman asked for

more, culminating with a request for access to the entire BLMIS Database and, one day

after a hearing held by the Discovery Arbitrator on November 19, 2018, she also

demanded access to all of the third-party records in the 13,000 boxes in the Queens

warehouse.  (AA17.)

The Discovery Arbitrator found that "the Trustee has repeatedly tried to

accommodate Ms. Chaitman's requests for BLMIS trading records."  (AA17.)

Furthermore, "[n]oticeably absent" from Chaitman's submission was any suggestion of

additional searches in the BLMIS Database that might yield relevant documents.

(AA17.)  In addition, Chaitman had failed to explain why her request had "morphed . . .

into a request that the Trustee wade through the 13,000 boxes of documents in the

warehouse."  (AA17.)  Likewise, Chaitman's assertion that the Trustee was only making

available documents that support his theory of the case was based on a "contorted view

of the record."  (AA17.)  When the Trustee's counsel stated that all the records Chaitman

17

needed to test Dubinsky's conclusions were in the E-Data Room, he was referencing the materials underlying the Dubinsky Report and not the universe of BLMIS files.  (AA17-18.)  Nor was Chaitman misled by counsel's statement.  She had always known that the Trustee had thousands of boxes of hard copy documents and thousands of items of electronic media that had not been processed.  (AA18.)

The Discovery Arbitrator concluded that the Defendants' assertion that the Trustee had proceeded in bad faith was "utterly unsupported by the record."  (AA18.) Additionally, Chaitman had failed to suggest a reasonable method of searching for any additional pre-1992 hard copy or electronic third-party trading records that might exist. (AA18.)  Although the Trustee was exceptionally well-funded,

> the Defendants have yet to establish that there is a basis to believe that any of the securities transactions undertaken by BLMIS's legitimate House 5 operations were intended to benefit its investment advisory customers or that the Court should indulge in that assumption.  Moreover, even if that were proven, there [has] been no showing that the efforts that the Trustee already has undertaken in an effort to locate pre-1992 BLMIS trading records are inadequate.  Indeed, despite being given digitized copies of hundreds of reels of microfilm, the Defendants have yet to show that they contain anything which would support their thesis that Madoff conducted actual trades for their accounts prior to 1992.  Nor have they demonstrated that the warehouse is likely to contain any documents that would be of use to them in this regard.

(AA18 (footnote omitted).)  Accordingly, "there is no basis for requiring the Trustee to supplement the extensive efforts that he has already undertaken by affording Ms. Chaitman unfettered access to the BLMIS Database or requiring him to rummage through all of the boxes in the warehouse in an attempt to find additional pre-1992 third-party trading records."  (AA18-19.)

## DISCUSSION

### 1.    Standard of Review

The Court granted Chaitman leave to appeal from the December *Order*.  (*Order Granting Leave to Appeal Discovery Arbitrator's January 2, 2019 Order*, Feb. 15, 2019 (AA333-35).)  The October 2016 order that appointed retired Magistrate Judge Maas as the Discovery Arbitrator in the case (but not in any adversary proceeding) set out the standard of review: "(i) findings of fact will be reviewed *de novo*; (ii) legal conclusions will be reviewed *de novo*; and (iii) rulings on procedural matters will be reviewed for abuse of discretion."  An order denying a motion to compel discovery is reviewed under an abuse of discretion standard.  *Shaw v. Prindle*, 661 F. App'x 16, 17 (2d Cir. 2016) (summary order) (citing *Gualandi v. Adams*, 385 F.3d 236, 244-45 (2d Cir. 2004)).  An abuse of discretion is a highly deferential standard and may be found only where the decision under review "rests on an error of law or a clearly erroneous finding of fact, or if the decision cannot be located within the range of permissible outcomes."  *Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 202 (2d Cir. 2013), *cert denied*, 571 U.S. 1237 (2014); *accord Zervos v. Verizon New York, Inc.,* 252 F.3d 163, 168-69 (2d Cir. 2001).

### 2.    Issues on Appeal

The Defendants' "Statement of Issues to be Presented on Appeal," (ECF Main Case Doc. # 18578-4), lists four issues:

> 1.    Can the Discovery Arbitrator enter an order that vitiates an order previously entered by this Court to put all Trading Records in the [E-Data Room]?

2.      Is the Trustee, with unlimited resources, permitted to take custody of millions of documents and refuse to produce documents this Court has ordered the Trustee to produce?

3.      Is the Trustee permitted to refuse to share access to the BLMIS Database when it would impose virtually no burden on the Trustee to share access and when the Trustee has never advanced a reason why he is shielding Madoff/BLMIS documents?

4.      Is it proper for the Discovery Arbitrator, in the face of the Trustee's violation of this Court's orders, to put the burden on the Defendants to "rummage" through the warehouse under the Trustee's exclusive control to locate the documents this Court ordered the Trustee to produce two years ago?

As is evident from the list, the Defendants' principal contention is that I ordered the Trustee to produce all of the trading records by putting them in the E-Data Room, the Trustee did not, the Discovery Arbitrator ignored the Court's order and "[t]he January 2, 2019 Order must be reversed on this basis alone." (*Defendants-Appellants' Memorandum of Law in Support of Their Appeal of Judge Maas' January 2, 2019 Order Denying Defendants' Motion to Compel the Trustee to Produce the Trading Records*, dated Mar. 18, 2019 ("*Defendants' Memo*"), at 11 (ECF Main Case Doc. # 18578-1).)  The Defendants also maintain that the production request, including the 13,000 boxes in the Queens warehouse, is not disproportionate or burdensome, (*id.* at 11-12, 14-15),[13] and the Discovery Arbitrator ignored evidence that House 5 had engaged

---

[13]      The heading to a section of the *Defendants' Memo* states "Judge Maas failed to consider that Defendants' counsel requested, in the alternative, for access to the BLMIS Warehouses so that Defendants' counsel could go through the documents." (*Defendants' Memo* at 14.)  The heading is disingenuous.  The text actually argues that the Trustee should review the 13,000 boxes for trading records, stating that "[w]hile the Trustee has now agreed to give Defendants' counsel access to the Queens Warehouse, this is imposing an unfair burden on Defendants." (*Id.*)

20

in real trading and Madoff had testified that prior to 1992 BLMIS had engaged in actual trading for the IA customers. (*Id.* at 13-14.)

The Trustee's opposing memorandum extensively recounts the long history of the discovery dispute regarding the trading records and the proceedings before this Court and the Discovery Arbitrator. (*Trustee's Memorandum of Law in Opposition to Defendants' Appeal of Judge Maas' January 2, 2019 Order Denying Defendants' Motion to Compel*, dated Apr. 1, 2019, at 1-22 (ECF Main Case Doc. # 18633).) In response to the Defendants' specific arguments, the Trustee contends that this Court never ordered the production of trading records, (*id.* at 23-26), the Defendants' request for 30 million documents in the BLMIS Database is disproportionate and burdensome, (*id.* at 26-30), the issue of real trading at BLMIS is irrelevant to a request for 30 million documents because, as the Discovery Arbitrator concluded, even if actual trading occurred, the Defendants had failed to show that it was undertaken for the IA customers prior to 1992, (*id.* at 30-31), and after insisting on access to the Queens warehouse and the Trustee agreeing to grant it, "Ms. Chaitman claims that this relief imposes an unfair burden on Defendants." (*Id.* at 31-32.)

### 3.    The May 2016 "Order"

The fundamental premise of the appeal, that I *ordered* the Trustee at the May 2016 hearing to produce all pre-1992 trading records, is wrong. As already discussed, Chaitman expressed a concern that the Trustee might supplement the E-Data Room and she would never know. I emphasized that the Trustee had a continuing duty to supplement which he would do by adding documents in the E-Data Room and Chaitman

21

might have a continuing duty to check the E-Data Room.  I did not consider proportionality or the burden of producing the records.  No order was issued at the May 2016 conference and Chaitman insisted she wanted to make a formal motion to obtain such an order.

The Defendants have also ignored what took place after May 2016.  The Defendants eventually made their motion to compel and the parties agreed to refer the motion to the Discovery Arbitrator, retired Magistrate Judge Maas.  His January 2017 order denied the Defendants' motion to compel production of the trading records sought through request numbers 16 and 18 because the investigation she sought would be too burdensome but if the Trustee discovered additional records, he would have to produce them.  The Defendants did not appeal.  Chaitman filed a second motion before the Discovery Arbitrator in February 2017.  The Discovery Arbitrator denied that motion without prejudice and established the Protocol which was designed to narrow the issues in what had become a long running, contentious dispute.  Again, the Defendants did not appeal.

Instead, they tried to ignore what transpired.  At a May 2018 conference before me, Chaitman stated that she wanted to make a motion for sanctions because the Trustee was not producing trading records.  She had failed to mention the Protocol of which I had been unaware until then.  After learning of the Protocol and the fact that it had not been followed, I told her that she would make the sanctions motion at her peril.  She then agreed to follow the Protocol and made the third motion to compel culminating in the *Order*.

22

Accordingly, the Discovery Arbitrator did not ignore my May 2016 "Order" or incorrectly interpret what I said.

### 4.    Relevance, Proportionality and Burden

Rule 26(b)(1) of the Federal Rules of Civil Procedure (made applicable in adversary proceedings under Rule 7026 of the Federal Rules of Bankruptcy Procedure) states in pertinent part:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

"The requesting party bears the initial burden of demonstrating any possibility of relevance sufficient to warrant discovery, but once that showing is made, the party resisting discovery bears the burden of demonstrating that the requests are irrelevant, or are overly broad, burdensome, or oppressive." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2016 WL 6779901, at *2 (S.D.N.Y. Nov. 16, 2016) (internal quotations omitted). The proportionality considerations are intended to "encourage judges to be more aggressive in identifying and discouraging discovery overuse." FED. R. CIV. P. 26(b)(1), advisory committee notes to 2015 amendments. "Proportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Vaigasi v. Solow Mgmt. Corp.*, No. 11-CV-5088 (RMB) (HBP), 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016).

The demand for trading records apparently had its origin in the Dubinsky Report and his conclusion that the IA business was always operated as a Ponzi scheme. Neither Dubinsky nor the Trustee ever contended that House 5 did not actually trade securities. In fact, Dubinsky determined that House 5 purchased equity securities and T-Bills for BLMIS's account using IA customers' money during the 2000s when the Ponzi scheme was unquestionably ongoing. (Dubinsky Report at ¶ 29.) He concluded, however, that the House 5 trades had no relationship to the securities that appeared on the IA customer statements.

Dubinsky first compared the House 5 equity securities positions as of October 31[14] for each of the years 2002 through 2008, reconciled those positions against the DTC records through which all of BLMIS's actual trades would have been recorded and then compared the House 5/DTC positions with the aggregate positions reported on the IA customer statements. (Dubinsky Report at ¶ 162.) Figure 16 appearing on page 68 of the Dubinsky Report is a bar graph that depicts the results of Dubinsky's analysis. He confirmed that the total equity shares held by BLMIS matched the DTC records but were substantially less than the aggregate amounts reported on the customer statements. For example, on October 31, 2002, House 5 held 368,687 equity shares but 674,933,936, or over 1,800 times that amount, were reported on the IA customer statements. The comparisons in subsequent years revealed the same disparities.

---

[14]    Dubinsky used October 31st for his equities analysis because BLMIS was supposedly in the equities markets on that date. (Dubinsky Report at ¶ 162 n. 174.)

Dubinsky performed a similar analysis with respect to positions in U.S. Treasuries.  (Dubinsky Report at ¶ 172.)  He determined the year-end House 5 U.S. Treasuries positions for 2002 through 2008,[15] compared the DTC records and the CUSIPs (a unique identifying number) held at the DTC with those reported as being held by House 5 and concluded that they matched.  (Dubinsky Report at ¶ 173.)  In contrast, none of the positions held at the DTC matched those reportedly held by the IA customers.  Moreover, as Table 5 on page 71 of the Dubinsky Report shows, the amounts reported on the IA customer statements dwarfed the amounts actually held by House 5 and reflected on the DTC's records.  For example, on December 31, 2002, House 5 held $84 million in U.S. Treasuries but the IA customers supposedly held $30,975,765,000.00, or nearly 369 times the amount held by House 5.  Again, the comparisons for the subsequent years yielded similar results, and thus, the equities and U.S. Treasuries reported on the customer statements were not cleared through or held by DTC or any other broker and were fictitious.[16]  (*See* Dubinsky Report at ¶¶ 164, 170, 174.)

---

[15]    Dubinsky used December 31 rather than October 31 to conduct his analysis because that was supposedly when BLMIS had exited the equities markets and held its funds in U.S. Treasuries or cash. (Dubinsky Report at ¶ 172 n. 177.)

[16]    Dubinsky also examined equity trades by Madoff Securities International Limited ("MSIL"), a U.K. subsidiary of BLMIS.  The majority of those trades were executed through House 5 and accounted for in the House 5 positions.  (Dubinsky Report at ¶ 168.)  He also examined the equities trades executed through brokers and concluded that none matched the purported trades made by the IA side of the business.  (Dubinsky Report at ¶ 169.)  Finally, BLMIS maintained an account with the Options Clearing Corporation ("OCC") to clear equity option trades.  The OCC records available for 2002-2008 show that the only option trades cleared through OCC matched the House 5 trading records.  The options reported on the IA customer statements could not have been cleared through OCC and were fictitious.  (*See* Dubinsky Report at ¶¶ 185-189.)

Dubinsky did not make similar comparisons for earlier periods, presumably because the DTC records were unavailable, and his opinion that BLMIS always operated as a Ponzi scheme was not based on any consideration of earlier trading records. Instead, his opinion was based primarily on anomalous or impossible trades appearing on the customer statements that often did not match the volume of trading or trading prices reflected in market information, impossible dividends and abnormally high and consistent returns. (Dubinsky Report at ¶¶ 18-24, 131-53, 190-98.) In addition, BLMIS created fake DTC records, (Dubinsky Report at ¶¶ 175-84), and the IA computer system, in contrast to the House 5 computer system, was geared to create fictitious trading records and lacked the functions needed to support actual trading. (Dubinsky Report ¶ 214-39.)

As the Discovery Arbitrator aptly noted, "the Defendants have yet to establish that there is a basis to believe that any of the securities transactions undertaken by BLMIS's legitimate House 5 operations were intended to benefit its investment advisory customers or that the Court should indulge in that assumption." (AA18.) In fact, the evidence for the period 2002-2008 discussed in the Dubinsky Report confirms that they were not. To rebut the inference raised by the Dubinsky analysis would require the Herculean effort of first computing a House 5 position on a particular day and then comparing that position to the aggregate positions supposedly "allocated" to all of the IA

───────────────────────

customers on that same day just as Dubinsky had done for the dates he selected.

Given the volume of records that the Trustee has amassed, his efforts to meet the Defendants' requests for pre-1992 trading records has been adequate. (AA17-19.)  He produced millions of documents, he ran search terms provided by the Defendants, he provided text searchable indices to the warehouse documents and the electronic media, and despite all of these efforts, the Defendants have failed to substantiate a claim that there are trading records that will support their theories or that the Trustee has proceeded in bad faith.  Instead, they want the Trustee to rummage through a BLMIS Database of 30 million documents and another 13,000 boxes of documents in the hope that he can cull out documents that will support their theory.  The Trustee has already expended $500,000 just restoring 201 reels of microfilm (there are over 5000) and the cost to the estate to digitize or produce all of the BLMIS records alone, without regard to the cost of searching them, would be monumental.

Moreover, this Court had suggested an approach with the microfilms that might have advanced some of these issues.  I had suggested that Chaitman select a representative sample of twenty reels based on the index, review them and if they contained relevant material, we could consider the next step.  (*See* TA559:17-560:3.)  At the May 2018 conference, Chaitman reported that she had chosen four reels, she didn't find anything relevant and concluded that it was not a productive way to go.  Instead, she intended to focus on the entire BLMIS Database.  (TA560:4-9.)  Still, she "has yet to suggest a reasonable method of searching for any additional pre-1992 hard copy or electronic third-party trading records that might exist."  (AA18.)  And whenever the

Trustee offers her access to something she has asked for, like the 13,000 boxes, she says its too much and he should review them.

Under the circumstances, I conclude that the Discovery Arbitrator did not abuse his discretion in denying the Defendants' motion to compel discovery. He reviewed the motion in light of the requirements of Rule 26 and concluded that although the Trustee was exceptionally well-funded, the request to produce the entire BLMIS Database and 13,000 boxes of hard copy documents was disproportionate and burdensome. In essence, the Trustee should not have to bear the cost associated with the Defendants' everchanging and ever growing discovery requests to review 30 million electronic documents in the BLMIS Database or 13,000 boxes of hard copy documents without some evidence to show that BLMIS made some trades for the benefit of the IA customers before 1992.

Accordingly, the *Order* is affirmed and the motion to compel is denied. The Court has considered the Defendants' remaining arguments and concludes that they lack merit. The Trustee may seek his expenses and attorneys' fees in accordance with Rule 37(a)(5)(B) of the Federal Rules of Civil Procedure by separate application.

So ordered.

Dated:  New York, New York
        August 26, 2019

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge

28